IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

NICHOLAS HANSON,               )
                               )
          Plaintiff,           )
                               )
     v.                        )     Case No.
                               )     04-3231-CV-S-REL-SSA
JO ANNE BARNHART, Commissioner )
of Social Security,            )
                               )
          Defendant.           )

### ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Nicholas Hanson seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for a period of disability and disability insurance benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that (1) the ALJ erred in finding that plaintiff could return to his past relevant work as a pastor, (2) the ALJ improperly discredited the opinion of Dr. Previti, and (3) the ALJ's residual functional capacity assessment is completely arbitrary. I find that the substantial evidence in the record supports the ALJ's finding that plaintiff retains the residual functional capacity to return to his past relevant work as a pastor. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.   BACKGROUND

On June 17, 2002, plaintiff applied for a period of disability and disability insurance benefits alleging that he had been disabled since July 2, 1996.  Plaintiff's disability stems from fibromyalgia, fatigue, sleeplessness, back pain, headaches, muscle and joint pain, depression, constricting throat, heart palpitations, pressure points, dizziness, hand numbness, osteoarthritis, temporomandibular joint syndrom, lip and feet blisters, irritable bowel syndrome, nausea, hot flashes, night sweats, chemical exposure, heavy metal poisoning, Lyme disease, voice weakness, and sensitivity to heat, cold, humidity, and odors.  Plaintiff's application was denied on August 30, 2002.  On December 2, 2003, a hearing was held before an Administrative Law Judge.  On February 26, 2004, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On May 28, 2004, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the

2

federal district court is whether the decision of the
Commissioner was supported by substantial evidence.  42
U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401
(1971); <u>Mittlestedt v. Apfel</u>, 204 F.3d 847, 850-51 (8th Cir.
2000); <u>Johnson v. Chater</u>, 108 F.3d 178, 179 (8th Cir. 1997);
<u>Andler v. Chater</u>, 100 F.3d 1389, 1392 (8th Cir. 1996).  The
determination of whether the Commissioner's decision is
supported by substantial evidence requires review of the
entire record, considering the evidence in support of and in
opposition to the Commissioner's decision.  <u>Universal Camera
Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951); <u>Thomas v. Sullivan</u>,
876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also
take into consideration the weight of the evidence in the
record and apply a balancing test to evidence which is
contradictory."  <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1136 (8th
Cir. 1998) (citing <u>Steadman v. Securities & Exchange
Commission</u>, 450 U.S. 91, 99 (1981)).

    Substantial evidence means "more than a mere scintilla.
It means such relevant evidence as a reasonable mind might
accept as adequate to support a conclusion."  <u>Richardson v.
Perales</u>, 402 U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d
1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial
evidence standard presupposes a zone of choice within which

3

the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These

4

regulations are codified at 20 C.F.R. §§ 404.1501, <u>et seq.</u>
The five-step sequential evaluation process used by the
Commissioner is outlined in 20 C.F.R. § 404.1520 and is
summarized as follows:

    1.   Is the claimant performing substantial gainful
activity?

                Yes = not disabled.
                No = go to next step.

    2.   Does the claimant have a severe impairment or a
combination of impairments which significantly limits his
ability to do basic work activities?

                No = not disabled.
                Yes = go to next step.

    3.   Does the impairment meet or equal a listed
impairment in Appendix 1?

                Yes = disabled.
                No = go to next step.

    4.   Does the impairment prevent the claimant from
doing past relevant work?

                No = not disabled.
                Yes =  go to next step where burden shifts to
Commissioner.

    5.   Does the impairment prevent the claimant from
doing any other work?

                Yes = disabled.
                No = not disabled.

## IV.  THE RECORD

The record consists of the testimony of plaintiff, his wife Leona Schacht, and vocational expert Dr. John McGowan, in addition to documentary evidence admitted at the hearing.

### A.  ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

The record shows that plaintiff earned the following income from 1985 through 2003:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1985 | $18,108.32 | 1995 | $13,524.00 |
| 1986 | 20,090.75 | 1996 | 7,082.78 |
| 1987 | 18,253.79 | 1997 | 1,016.00 |
| 1988 | 6,821.37 | 1998 | 0.00 |
| 1989 | 19,114.69 | 1999 | 0.00 |
| 1990 | 10,421.22 | 2000 | 0.00 |
| 1991 | 5,848.25 | 2001 | 0.00 |
| 1992 | 7,078.07 | 2002 | 0.00 |
| 1993 | 12,965.50 | 2003 | 0.00 |
| 1994 | 7,370.00 | | |

(Tr. at 56).

**Department of Veteran's Affairs Monthly Entitlement**

Plaintiff received $1,314 per month beginning on August 1, 2002 from the Department of Veteran's Affairs (Tr. at 52). On June 23, 2003, when one of his children reached the age of 18, plaintiff's benefits were reduced to $1,178 per month. On July 11, 2006, when plaintiff's next child reaches 18, his benefits will drop to $1,043 per month. Finally, on January 24, 2008, when his third child reaches the age of 18, his benefits will be reduced to $796 per month.

**Work History Report**

In a Work History Report dated August 4, 2002, plaintiff reported that he worked as a pastor from April 1990 until June 1992 (Tr. at 101). In that job, his duties included secretarial functions, calling on people, studying, preparing sermons, traveling, record keeping, custodial and maintenance, yard work, being a diplomat, preaching, leading worship, preparing bulletins and newsletters, making phone calls, ordering, teaching classes, and attending meetings and seminars (Tr. at 103). He estimated that he would walk four hours per day; stand two hours per day; sit four hours per day; stoop, kneel, and crouch one hour per day; reach two hours per day; and write, type, or handle small objects

7

for four hours per day (Tr. at 103).  The heaviest item he lifted was 50 pounds, and he frequently lifted ten pounds (Tr. at 103).

Plaintiff also worked as a pastor from June 1992 until April 1994 (Tr. at 101).  In addition to duplicate duties from the first pastoral job, plaintiff was the food bank director (Tr. at 105).  The heaviest weight he lifted was 100 pounds, and he frequently lifted 50 pounds (Tr. at 105).

Plaintiff worked as a part-time pastor from September 1997 through December 1997, having the same duties as his most recent pastoral position (Tr. at 101, 107).  At this job, the heaviest weight he lifted was 20 pounds and he frequently lifted ten pounds (Tr. at 107).

At the end of the form, plaintiff wrote, "I am in the process on [sic] getting a divorce and do not have access to ANY of my records and cannot gain access at this time. Amounts and dates are all guess-ta-mations." (Tr. at 108).

**Letter from plaintiff's wife**

During the hearing on December 2, 2003, plaintiff's new wife, Leona Schacht, presented a letter to the ALJ (Tr. at 118-121).  Plaintiff's wife stated, among other things, that plaintiff takes her daughters to their music lessons each week (Tr. at 117).  She also commented that he has dizzy

8

spells (Tr. at 120). "Once I saw him fall out of a chair in which he was just sitting." (Tr. at 120).

**Letter from plaintiff's son**

During the hearing, a letter from plaintiff's son was admitted (Tr. at 122). Plaintiff's son indicated that plaintiff had a heat stroke in the mid 1990's. Before the heat stroke, plaintiff was able to work ten hours. After the heat stroke, he could not even work two hours and asked his sons to do a lot of his work.

**B.    *SUMMARY OF MEDICAL RECORDS***

On April 4, 1995, plaintiff saw Steven Hinshaw, D.O., for sinus problems (Tr. at 131).

July 2, 1996, is plaintiff's alleged onset date of disability.

On July 17, 1996, plaintiff saw Dr. Hinshaw and complained of aching all over, head stopped up, sore throat, and dizziness for four days (Tr. at 132). The remainder of the record is illegible.

On July 22, 1996, plaintiff saw Dr. Hinshaw and complained of blisters in his mouth and being lightheaded (Tr. at 134). The remainder of the record is illegible.

On August 12, 1996, plaintiff returned to see Dr. Hinshaw (Tr. at 134). Plaintiff complained that he did not

"feel right". He was lightheaded and weak, his heart was beating harder than usual when he was going to bed, and his throat felt closed up. The remainder of the record is illegible.

The following day, plaintiff began wearing a Holter monitor (Tr. at 134). He also saw John Bond, M.D., who performed an upper GI series (Tr. at 140). It was a normal study with the exception of possible low grade or mild gastritis.

On August 14, 1996, plaintiff stopped wearing the Holter monitor (Tr. at 134). The results were normal (Tr. at 136-137).

On September 23, 1996, plaintiff saw Dr. Hinshaw for a recheck (Tr. at 138). He complained that he had no stamina, very slow progress, was still having hot flashes ("one hot flash one week ago, started 7/17/96"). The remainder of the record is illegible.

There are no relevant medical records from September 1996 until July 2000.

On July 12, 2000, plaintiff saw Uzma Kahn, M.D. (Tr. at 142). Plaintiff complained of chest pains that started the day before, was on no medications. Dr. Kahn performed an EKG. She instructed plaintiff to decrease his caffeine

10

intake, and she prescribed Acephex [used to treat excess stomach acid].

Plaintiff returned to see Dr. Kahn on July 20, 2000 (Tr. at 143). Plaintiff complained of pain in his head, neck, back, and hips; sweating; very stressed because of social problems. He was taking only Aciphex. His temperature was 99.3. Dr. Kahn's diagnosis was possible tick fever, symptoms could be secondary to stress. She prescribed Doxycycline (an antibiotic) and directed plaintiff to return in five days.

Plaintiff returned to see Dr. Kahn on July 25, 2000, for a general physical exam (Tr. at 145). Plaintiff complained of experiencing the following since 1996: decreased energy level for three to four years, gets real hot frequently, sluggish, diarrhea off and on, headaches two times per week (sleep helps, no over-the-counter medications help), hurts at temples and back of head and results in increased light and sound sensitivity, his right foot hurts at night (feels like a hot poker). Dr. Kahn assessed fatigue, stress, arthritis, tinea petis [a foot infection with mold-like fungi] and electrolyte imbalance. She prescribed Vioxx as needed for pain, 20 pills with no refills, and Cortisone cream.

11

On August 18, 2000, plaintiff saw Dr. Kahn for a follow up (Tr. at 148). Plaintiff reported that he thinks he has sleep apnea, he wakes up constantly, counts heart rate down to 46, has dizzy spells almost every day, and vitamins make him sick. Dr. Kahn diagnosed insomnia and bradycardia [abnormally slow heart rhythm]. She prescribed a sleep study and encouraged a healthy diet.

On August 29, 2000, plaintiff saw A. N. Reddy, M.D., for a sleep study (Tr. at 161-162). "The patient had a total of 363 minutes in the bed. Sleep time is 315 minutes. . . The patient was awake for 43 minutes after sleep onset. Sleep efficiency was 87%, which is reduced. . . . The sleep disturbance summary shows a total of 30 arousals and 10 awakenings. . . . There were no respiratory arousals. There were 23 jerk arousals. No snore arousals. . . . The respiratory summary shows there are 2 hypopneas[1] and no apneas[2]. The index is within normal limits. The oximetry summary shows the average saturation was 94%. The lowest was 85%. No significant desaturation is noted. The EKG

_____

[1]Breathing that is shallower and/or slower than normal.

[2]Absence of breathing.

12

summary shows the average heart through the night was 48.
No significant rhythm problems are noted."

Plaintiff saw Dr. Kahn on October 10, 2000, for
worsened shoulder pain (Tr. at 149). Plaintiff stated that
his shoulders are not complete joints, which is hereditary.
Dr. Kahn assessed shoulder and neck pain. She referred
plaintiff to Dr. Hubbard for evaluation and treatment, and
she prescribed Motrin and Flexeril (a muscle relaxer).

Plaintiff saw Gregory Hubbard, D.O., on October 25,
2000 (Tr. at 184-188). Plaintiff complained of right arm,
wrist and shoulder pain. He said that lifting overhead
exacerbates the pain. "Patient associates being jerked by a
colt, in the spring, with this pain in his shoulder. . . .
Patient is a married white male who is a farmer. He does
not smoke or drink." Plaintiff had some limitation of range
of motion of his cervical spine, no signs of cervical
radiculopathy with compression or with range of motion.
Positive impingement sign on his right shoulder, good range
of motion however. No weakness. Positive Tinel's and
carpal tunnel compression test on right wrist. Dr.
Hubbard's impression was carpal tunnel syndrome on right
hand, rotator cuff tendonitis as well as AC joint
degenerative joint disease, right shoulder. He recommended

13

a nerve conduction study for carpal tunnel syndrome and gave plaintiff a sheet for exercises of his shoulder to maintain range of motion.

On November 21, 2000, plaintiff returned to see Dr. Hubbard (Tr. at 189). Plaintiff complained of shoulder and wrist pain. Impression: moderately severe carpal tunnel syndrome, right wrist.

Plaintiff returned to see Dr. Hubbard on November 27, 2000 (Tr. at 192). Dr. Hubbard scheduled carpal tunnel release, noted that plaintiff's heart is of regular rate and rhythm. He gave plaintiff an anti-inflammatory for his shoulder.

On December 7, 2000, Dr. Hubbard performed a carpal tunnel release on plaintiff's right hand (Tr. at 163-164, 193-194). Plaintiff returned for a follow up on December 15, 2000 (Tr. at 195). Dr. Hubbard told plaintiff to do range of motion exercises and come back in a week to get the stitches out because the wound had not healed all the way yet.

On December 22, 2000, plaintiff returned to see Dr. Hubbard (Tr. at 196). "Patient still has some gapping of his wounds at certain areas. His wound healing capacity is somewhat decreased. . . . Patient has no complaints of

14

pain." Dr. Hubbard removed the stitches and applied steri-strips. He told plaintiff to perform gentle range of motion exercises and avoid any strengthening until the wound completely closes.

On January 5, 2001, plaintiff saw Dr. Hubbard for a follow up (Tr. at 197, 198). Plaintiff complained of some swelling and said his hand aches at night. "Patient is slowly returning to normal activities." Plaintiff was told to follow up in one month.

Plaintiff returned to see Dr. Hubbard on February 2, 2001 (Tr. at 197, 199). "Patient has progressed well. He is back to full strength and full activity of this hand. He does have some perception of swelling. I am not able to appreciate this in the clinic today. Patient has no numbness or tingling in his hand. He is pleased with his results." Plaintiff's pulse was 56. Dr. Hubbard instructed plaintiff to follow up as needed.

On March 5, 2001, plaintiff returned to see Dr. Kahn (Tr. at 150). Plaintiff complained of coughing and congestion. Dr. Kahn assessed upper respiratory infection. Plaintiff wanted a pneumonia vaccine, was told to come back in two weeks for the vaccine if he felt better.

15

On January 25, 2002, plaintiff saw J. Michael Sterchi, M.D., for hernia repair (Tr. at 220-222). He was discharged the next day.

On February 19, 2002, plaintiff saw Dr. Kahn for a general physical (Tr. at 153). Plaintiff said he was tired a lot. Plaintiff said he had hip pain due to being born with abnormal hips. Plaintiff reported that he "does odd jobs". Dr. Kahn assessed fatigue, insomnia, bilateral hip pain, and electrolyte imbalance. She referred plaintiff to Dr. Hubbard for treatment of hip pain.

Plaintiff saw Dr. Hubbard on March 4, 2002 (Tr. at 200-202). Plaintiff complained of bilateral hip pain and back pain over the last three months, worse over the last two weeks. Plaintiff reported that he is a farmer. Plaintiff's pulse was 62. X-rays showed "very mild arthritis of his bi-lateral hips." Dr. Hubbard recommended a CT scan.

On March 6, 2002, plaintiff saw C. Rob Armstrong, M.D., who performed a CT scan of plaintiff's lumbar spine (Tr. at 173, 204). Opinion: "Left posterolateral protrusion of the L4-5 disk potentially affecting left L4 extra foraminal nerve root."

On March 18, 2002, plaintiff saw Dr. Hubbard (Tr. at 205). "Patient has a positive straight leg raising sign as

16

well as this vague pain about the left hip.  Patient
maintains good internal and external rotation of this hip.
Patient ambulates with a mild antalgic gait[3]."  Diagnosed
herniated lumbar disc.  Recommended epidural steroid
injections.

March 31, 2002, is plaintiff's last insured date.

On April 2, 2002, plaintiff saw Richard Thompson, M.D.
(Tr. at 178-182).  Plaintiff's chief complaint was lower
back pain radiating into the left leg.  Plaintiff reported
that he had had this pain for the last six months.  Standing
aggravates his pain.  When asked if he is unable to work
because of his pain, he wrote "sometimes".  Dr. Thompson
gave plaintiff an epidural steroid injection.

On June 3, 2002, plaintiff went to the Ripley County
Family Clinic (Tr. at 225, 228-230).  Plaintiff complained
of aching joints, headaches, unable to sleep well at night.
He was not on any medications.  The remainder of the record
is illegible.  Plaintiff's lab work was all normal,
including thyroid panel, rheumatoid arthritis factor, and
antinuclear antibodies.

---

[3]A gait assumed in order to avoid or lessen pain.

17

On June 17, 2002, plaintiff filed his application for disability benefits alleging a July 2, 1996, onset date.

On July 1, 2002, plaintiff returned to the Ripley County Family Clinic (Tr. at 226). He complained of pain in his hands, toes, legs, hips, and back; headache; dizziness; tinnitus [ringing in the ears]; upset stomach; sleeplessness; joint swelling; and fatigue. The rest of the record is illegible.

On July 16, 2002, plaintiff saw Kenneth Mann, D.O., who performed an MRI of plaintiff's lumbar spine (Tr. at 272). Dr. Mann's impression was:

1.  Minimal encroachment of the neural foramina bilaterally at L3-4 and L4-5 secondary to diffuse annular intervertebral disc bulge.

2.  No focal disc protrusion, extrusion or central canal stenosis seen.

3.  Disc desiccation at T11-T12, L3-4, L4-5 and L5-S1.

On August 28, 2002, Vincent Previti, M.D., a non-examining consulting physician, completed a Physical Residual Functional Capacity Assessment (Tr. at 232-239). He found that plaintiff could occasionally lift ten pounds; frequently lift less than ten pounds; stand or walk at least two hours in an eight-hour day; sit about six hours in an

18

eight-hour day; and has an unlimited ability to push and pull other than the lifting limitation. In support of these findings, he wrote: "46 year old male with allegations of muscle aches and pains every day, headaches, fatigue, back pain and 5 pages of typed allegations attached to claimant questionnaire. CT [scan of] lumber spine performed 3/6/02 for back pain showed left posterolateral protrusion extra foraminal nerve root. At 3/18/02 office visit a positive straight leg raising sign as well as vague pain about left hip was noted. There was good internal and external rotation of the hips. He was referred for epidural steroid injection. 3/4/02 x-ray hips showed mild arthritis."

Dr. Previti found that plaintiff could occasionally climb, balance, stoop, kneel, crouch, or crawl. He had no manipulative limitations such as reaching, and he had no visual limitations. His ability to speak was limited, and this finding was based on claimant's allegations of weak voice. Dr. Previti noted: "No objective evidence to support this." He found that plaintiff could have unlimited exposure to wetness, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards such as machinery and heights. He found that plaintiff should avoid concentrated exposure to extreme cold, extreme heat, noise, vibration, and

19

humidity (Dr. Previti checked both "unlimited" and "avoid
concentrated exposure" to humidity). These findings were
based solely on plaintiff's allegations, and that was noted
by Dr. Previti (Tr. at 236). The final page of explanations
notes more of plaintiff's allegations, and Dr. Previti
wrote, "claimant's allegations (5 typed pages) are concluded
to be partially credible. This RFC is reduced to reflect
this". Dr. Previti noted that there was no treating or
examining source statement regarding plaintiff's physical
capacities in the file.

On August 29, 2002, Dr. Aram, Psy.D., completed a
Psychiatric Review Technique (Tr. at 240-253). Dr. Aram
found no medically determinable mental impairment. In
support, Dr. Aram wrote, "Claimant is 46 year old male who
on his application lists fibromyalgia as his only
impairment, but on activities of daily living (addendum
typed and 5 pages) he lists numerous psych symptoms. He
states he does not have any med prescribed, seeks treatment
for physical symptoms only".

On August 29, 2002, plaintiff went to Cox Health to
establish care (Tr. at 255-257). His chief complaint was
swelling in his right arm above the elbow, which started
August 12, 2002. Plaintiff provided a five-page list of

complaints, but asked the doctor to focus on Lyme's disease right now. Plaintiff's pulse was 56. He was on no medications. Plaintiff was diagnosed with fatigue with myalgias [muscle pain] and wasp sting allergy.

The doctor recommended initial blood work for myalgia and fatigue consisting of TSH, DBED, CMP, CRP, ANA, and rheumatoid factor. A prescription was written for an Epi-pen (for wasp sting allergy).

On August 30, 2002, plaintiff's application for disability benefits was denied.

Plaintiff was admitted to the Ozarks Medical Center from September 15, 2002, through September 22, 2002 (Tr. at 266-269). Plaintiff was initially seen in the clinic several weeks before his admission. He had been stung by a bee on his finger while he was driving his car, had some dizziness and shortness of breath. He was treated at the emergency room for an allergic reaction. About two weeks later, he noted swelling in the third finger where he had been stung by the bee and went to the emergency room. He was given Ancef IV and then placed on Keflex. The next day he was seen in the VA Clinic and placed on Levaquin and Ibuprofen. The lymph node continued to grow and on September 13, 2002, he was noted to have marked erythema and

21

additional lymphadenopathy to the arm.  Blood cultures were
collected.  Plaintiff had a fever and cultures were positive
for Staphylococcus hemolyticus, which was resistant to the
medication he was on and sensitive to Vancomycin.  The
medications were discontinued and he was started on
Vancomycin, and was discharged four days later.  During the
hospital stay, it was noted that plaintiff had no throat
inflammation, and his heart was normal.

On September 27, 2002, plaintiff saw R. T. Lewandowski,
M.D., at Cox Health (Tr. at 258-259).  Plaintiff complained
of heartburn and dizziness.  He had a staph infection on his
arm, and was still on IV antibiotics.  Dr. Lewandowski
continued plaintiff on Vancomycin for the staph infection
and indicated he would consult Dr. Eck for a biopsy.

Three days later, plaintiff saw Dr. Eck (Tr. at 278).
He had scheduled a biopsy; however, plaintiff indicated he
had much improvement over the last 24 hours.  Dr. Eck
recommended continuing medical treatment for another week or
so.

Plaintiff returned to see Dr. Lewandowski on October 9,
2002 (Tr. at 259).  Dr. Lewandowski noted that between his
last visit and the scheduled appointment with Dr. Eck,
plaintiff's symptoms improved and the size of the lymph node

had gone down significantly. He discontinued all medication and told plaintiff to follow up as needed "without any further treatment planned."

On October 11, 2002, plaintiff saw Rick Walker, D.O., for chronic back pain (Tr. at 279-280). Sitting and stooping forward relieve his back pain. Plaintiff had negative straight leg raising, muscle strength was 5, no atrophy, and x-rays of his lumbar spine were normal. MRI of lumbar spine revealed disc desiccation and loss of signal intensity on T1 and T2 images at L4-L5. "There also seems to be a bulging disk at L4-L5, L5-S1. There may be some mild concentric stenosis at L4-L5." Dr. Walker assessed chronic neck and back pain. He recommended pain clinic evaluation and possible rheumatology consultation. "At the present time I do not see any surgical lesions or any indications for surgical intervention of his back pain."

On January 13, 2003, plaintiff was seen at the VA Hospital (Tr. at 324-328). He described his pain as a three to four. He had a negative mental depression screen. Plaintiff requested that the doctor complete a physical exam form; however, the doctor indicated there was not enough time that day, will do that at a future visit.

23

On January 22, 2003, plaintiff had two chest x-rays taken at the VA Hospital (Tr. at 333). There was no evidence of acute cardiopulmonary process.

Plaintiff returned to the VA Hospital on February 25, 2003 (Tr. at 320-323, 334). Plaintiff was there for completion of a medical form for adoption purposes. He was diagnosed with bradycardia [slow heart rate]. "Patient takes no current prescription medications. . . . Counseled with patient significance of bradycardia. This may be associated with patient's complaint of chronic fatigue. Counseled with patient regarding recommendations for further cardiac diagnostic work up, which patient DECLINED at this time. He indicated he may wish to accept these services at future date."

Plaintiff went to the VA Hospital on May 21, 2003 (Tr. at 319). "Patient reports no pain at this visit."

A Holter monitor was applied on June 2, 2003, and on June 6, 2003, "no significant arrhythmias" were noted (Tr. at 306, 342).

On July 17, 2003, plaintiff returned to the VA Hospital with complaints of dizziness and lightheadedness (Tr. at 313-314). He was informed that he should not operate heavy

24

machinery, work in high places like on a roof, or drive until the cause of his dizziness was determined.

Plaintiff had a treadmill stress test on August 22, 2003, which was normal (Tr. at 310-312). He had a tilt table test on September 23, 2003, which was negative (Tr. at 309). On October 6, 2003, he had an echocardiogram at the VA Hospital (Tr. at 297-301). That showed mild pulmonary insufficiency. A CT scan of the head was unremarkable; 2 x-rays of the chest showed a normal heart and no evidence of acute cardiopulmonary process.

## C. SUMMARY OF TESTIMONY

During the December 2, 2003, hearing, plaintiff, his wife, and Dr. John McGowan, a vocational expert, testified.

### 1. Plaintiff's testimony.

Plaintiff was born in 1956 and is currently 49 years of age (Tr. at 374). He is six feet tall and weighs about 180 pounds (Tr. at 375).

Plaintiff married Leona Schacht in September 2003 (Tr. at 375). She does not work outside the home (Tr. at 375). Between the two of them, they have seven children, one 18-year-old, two are age 15, one 13-year-old, 11-year-old twins, and a four-year-old (Tr. at 376). Three boys, 13, 15, and 18, are plaintiff's, and the other children are

25

Leona's (Tr. at 376).  Plaintiff lives in a house with a
walk-out basement (Tr. at 376-377).  Plaintiff drove himself
to the administrative hearing, which was a 25-mile trip (Tr.
at 377).  He had no trouble making the trip which took about
30 minutes (Tr. at 377).

Plaintiff has a high school education and three years
of bible college (Tr. at 377).  He dropped out of college in
1985 when he entered the ministry (Tr. at 378).  Plaintiff
was in the Navy from 1974 to 1975 and was honorably
discharged (Tr. at 378-379).  He receives a non-service
connected disability benefit (Tr. at 379).

Plaintiff last worked at a heating and air conditioning
company in 1996 (Tr. at 379).  He sometimes had to read blue
prints (Tr. at 379).  He learned to install heaters and air
conditioners while working his way through college (Tr. at
380).

Plaintiff testified that he typed the five-page list of
his impairments; however, it took him about six months to
compile it and he could only type for about 30 minutes at a
time (Tr. at 358).

Plaintiff was unable to hold down a full-time job after
July 1996 because of pain and fatigue (Tr. at 359).  He has
constant headaches, and he experiences back pain (Tr. at

26

359).  The pain goes into both his hips, his feet, his shoulders, and his neck (Tr. at 360).  Plaintiff's hands go numb a lot (Tr. at 360).

Plaintiff's back pain is constant, and he rates it a six to seven out of ten (Tr. at 361).  The pain goes up to nine sometimes (Tr. at 361).  Plaintiff's back pain is constantly radiating into his hips (Tr. at 362).  The hip pain is as severe as the back pain, but further down his legs the pain is not as bad (Tr. at 362).  Sitting aggravates his pain, walking aggravates his pain, he can only stand for about five minutes before the pain starts getting worse (Tr. at 362-363).  Bending and stooping cause problems for plaintiff (Tr. at 363).  He could bend and stoop, but it causes more pain and he has less mobility for the next two days (Tr. at 363).

Plaintiff has sharp stabbing pains in his upper and mid back (Tr. at 363).  That pain is about a four or five most of the time (Tr. at 363).  About 75% of the time, the pain radiates into plaintiff's neck and shoulders (Tr. at 363-364).  Plaintiff's hands also go numb from sitting in chairs (Tr. at 364).  Plaintiff's carpal tunnel surgery did not help at all (Tr. at 364).  He cannot hold a pencil for very long and that is why he types things (Tr. at 365).

27

Plaintiff has had problems with his hands swelling (Tr. at 365-366). Plaintiff cannot reach over shoulder level because his shoulders are not completely formed (Tr. at 366). He has had that problem since birth (Tr. at 367). His doctors have told him that every time he lifts his arm above his shoulder, he will decrease the life of his shoulder joint (Tr. at 367).

Plaintiff's neck causes him to have headaches (Tr. at 367-368). Plaintiff's headaches are a seven to an eight on the pain scale, and sometimes it would reach a ten (Tr. at 368). Plaintiff's headaches last two to four days and he suffers from nausea while he has headaches (Tr. at 368). He would have a new headache a day or two after the previous one went away (Tr. at 369). Plaintiff "tried different things" for his headaches but nothing provided relief (Tr. at 369). He told his doctors about his headaches, but he never went to the hospital because of one (Tr. at 369).

Plaintiff has occasionally had chest pain and heart palpitations (Tr. at 370). He is fatigued all the time and does not feel rested after sleeping (Tr. at 370). Plaintiff lies down once or twice during the day for 30 minutes or more (Tr. at 371). "[Y]ou know with kids in the house it's

28

– they, they don't let you do that very long.  Whenever, whenever I could get away with." (Tr. at 371).

Plaintiff experiences dizziness up to four times per day for 30 to 60 seconds (Tr. at 371).  A lot of times he would fall down (Tr. at 371).  He has never passed out, but one time he fell out of a chair when he got dizzy (Tr. at 371-372).

Plaintiff sometimes feels depressed, he has problems concentrating and maintaining focus (Tr. at 372).  He will get stuck on a sentence and have to read it four or five times (Tr. at 372).

Before plaintiff's onset of disability, he was a very fast worker.  "I had a foreman tell me, you know, before I got sick that I worked too fast and I need to slow down, I was making everything look bad – you know, I, I was the guy that I would go out there, I went to work during this one shop, I was the low guy on the totem pole and I worked my way up to the top of the, of the workers there in six months." (Tr. at 374).

Plaintiff sees a doctor at the VA Hospital once every few months (Tr. at 381).  At the time of the administrative hearing, he was taking no medications (Tr. at 382).

29

The ALJ noted that plaintiff's hair is arm length and he wears it in braided curls and his beard goes to the middle of his chest (Tr. at 384). Plaintiff washes his hair every day and he combs and trims his hair and beard (Tr. at 391).

Plaintiff uses a back brace sometimes (Tr. at 385). He testified that a chiropractor told him to use it when he needs to (Tr. at 385). He does not wear wrist splints or elbow braces (Tr. at 386). Plaintiff believes he could lift and carry about 20 pounds (Tr. at 386). Plaintiff goes down to his basement every day, but he has trouble on the stairs (Tr. at 387). Plaintiff has a driver's license with no restrictions (Tr. at 387). Plaintiff can walk about a quarter of a mile before he has to stop and rest (Tr. at 388). Plaintiff has problems with his lymph nodes swelling (Tr. at 389). That comes and goes, and he is treated with medication (Tr. at 390).

Plaintiff lives on a small 25-acre farm with dairy goats (Tr. at 391, 392). They have to be milked twice a day, and when the kids cannot do that plaintiff milks them (Tr. at 391). Plaintiff also owns chickens, ducks, and peafowl (Tr. at 393). Plaintiff helps his kids keep the fences in good repair and feed the animals (Tr. at 393).

30

Plaintiff gets up between 5:30 and 6:30 in the morning, and he goes to bed between 9:00 and 10:00 at night (Tr. at 395). He usually lies down in the afternoon to rest (Tr. at 396). Plaintiff occasionally cooks, he puts his own dishes in the dishwasher (Tr. at 391-392).

Plaintiff testified that he lived off his previous wife's income when he was married to her (Tr. at 397). Plaintiff and his previous wife divorced in the summer a few months before the administrative hearing (Tr. at 398-399). Now he lives off his VA disability (Tr. at 397). Plaintiff does not know why he was found disabled (Tr. at 397-398). The four-year-old child living with plaintiff is actually his wife's grandchild (Tr. at 398). Until the adoption is complete, Leona gets $136 per month from the State of Missouri for that child (Tr. at 398).

Plaintiff met his current wife in 2000 at a swamp meet where people bring animals (Tr. at 399). He and Leona got married in September 2003 (Tr. at 375).

2.   **Testimony of Leona Schacht.**

Leona Schacht testified that she is plaintiff's wife (Tr. at 401). This is her fourth marriage (Tr. at 401). She does not work, she stays home with her children (Tr. at 401).

As long as Ms. Schacht has known plaintiff, he has
needed to lie down during the day because of pain, fatigue,
and depression (Tr. at 402).  Plaintiff has not been on any
medication since he was on IV medication for his staph
infection (Tr. at 403).

### 3.  **Vocational expert testimony.**

Vocational expert Dr. John McGowan testified at the
request of the Administrative Law Judge.  The ALJ's first
hypothetical involved an individual who could lift ten
pounds occasionally and less than ten pounds frequently;
could stand or walk for two hours in an eight-hour day; can
sit for six hours in an eight-hour day; has unlimited
ability to push and pull except for the lifting
restrictions; can occasionally climb, balance, stoop, kneel,
crouch, or crawl; with somewhat limited speaking in that he
has a weak voice; and must avoid concentrated exposure to
extreme cold, extreme heat, humidity, noise, and vibration
(Tr. at 413).  The vocational expert testified that such a
person could not return to plaintiff's past relevant work
(Tr. at 414).  The person could, however, do direct assembly
of semi-conductors with 41 jobs in the 12-county area and
1,670 in the State of Missouri (Tr. at 416).  The person

32

could also be a surveillance system monitor with about 31 jobs in the region and 280 jobs in Missouri (Tr. at 417).

The second hypothetical added to the first hypothetical the restriction that the person could only occasionally reach, handle, finger, or feel with the dominant hand (Tr. at 420-421). Such a person could not perform any work (Tr. at 421).

The third hypothetical again used the first hypothetical with the added restriction that the person would be "half the speed" of a normal worker (Tr. at 421). Such a person could not work (Tr. at 421).

If a person missed two to four days of work per month due to pain, the person could not work (Tr. at 421).

## V.   FINDINGS OF THE ALJ

The ALJ first noted that plaintiff had previously filed an application for disability benefits on February 11, 1998, alleging an onset date of disability of July 2, 1996 (Tr. at 13). The claim was denied on April 28, 1998, with no appeal (Tr. at 13). The ALJ determined that "[b]ecause the claimant filed his current application after the four-year period following the date of the notice of the initial determination made with respect to the prior application, there is no allegation or evidence of fraud, similar fault,

33

or other specific conditions, the prior determination is not subject to reopening. 20 CFR 404.988." (Tr. at 14).

The ALJ found that plaintiff's past work experience includes employment as a pastor, metal fabricator, and heating and air conditioning technician (Tr. at 14). He served in the U.S. Navy from 1974 to 1975 and receives non-service disability connected veteran's benefits (Tr. at 14).

Step one. The ALJ determined that plaintiff met the nondisability requirements and was insured for disability benefits through March 31, 2002 (Tr. at 15). At step one of the sequential analysis, the ALJ found that plaintiff has not worked since his alleged onset date (Tr. at 16).

Step two. The ALJ wrote at length about each of plaintiff's alleged impairments before determining which were "severe". The order reads in part as follows:

> The claimant alleged fibromyalgia, but medical treatment records do not indicate 13 of 18 positive tender points. To the contrary, examination by Dr. Walker on October 11, 2002, indicates no distinct positive trigger or tender points. . . . The claimant's right upper extremity lymphadenitis and cellulitis . . . did not impose symptoms and limitations for a period for 12 continuous months.
>
> . . . There is no objective medical evidence of a medically determinable and diagnosed cardiac impairment imposing significant, or more than minor, symptoms or physical functional limitations.

34

. . . [T]here is no objective evidence of significant symptoms or functional limitations due to the claimant's alleged sleep difficulties.

. . . [C]ervical spine x-ray examination in October 2002 was normal. . . . The claimant has not sought regular medical treatment for complaints of neck pain and does not require pain medication or other prescribed medical therapy.

. . . There is no evidence of headache pain of a severity and frequency to interfere with the claimant's capacity to maintain a normal work schedule.

The claimant alleged joint and muscle aches, but there is no objective evidence of extremity weakness, chronic muscle spasms, persistent inflammatory signs, or significant joint range of motion limitation and the claimant does not require pain medication or other prescribed medical therapy.

The claimant alleged his throat constricts causing shortness of breath. . . . [U]pper GI series in August 1996 . . . [was] normal. . . . The claimant has not sought medical treatment for this condition since August 1996.

There is no objective medical evidence of medically determinable and diagnosed tinnitus, tremors, vertigo, temporomandibular joint syndrome, or irritable bowel syndrome.

The claimant has not sought or required medical treatment for hot flashes, night sweats, voice weakness, or sensitivity to heat, cold, humidity, or odors.

. . . . [T]here is no objective evidence of positive laboratory Lyme screen panel, diagnosis, or medical treatment for [Lyme disease].

. . . The claimant has not sought or required treatment for blisters or mouth sores since July 1996.

The claimant alleged nausea, gas, and upset stomach. . . . [T]here is no evidence of significant symptoms or functional limitations due to this condition.

The claimant complained of urinary flow problems but has not sought medical treatment for this alleged condition.

The claimant alleged chemical herbicide exposure and heavy metal poisoning, but there is no acceptable medical evidence of such a medically determinable or diagnosed condition imposing significant symptoms or functional limitations.

The claimant's lymphadenitis, sleep inefficiency, gastritis, hernia repair, headaches, and mouth sores, represent minor or acute illnesses resulting in no significant long-term functional limitations or complications.

. . . [There is no objective evidence of a medically determinable and diagnosed depressive or affective disorder. . . .

The objective evidence of record, when considered as a whole, does not establish that the claimant has a "severe" medically determinable and diagnosed mental impairment. . . .

(Tr. at 19-21).

The ALJ determined that plaintiff suffers from degenerative disc disease of the lumbar spine, residuals of right carpal tunnel syndrome release, and mild hip osteoarthritis - impairments that are severe.

Step three. The ALJ found that none of plaintiff's severe impairments, either singly or in combination, meet or equal a listed impairment (Tr. at 21).

36

Step four.  The ALJ discussed at length the medical
evidence in this case.  He accepted the non-examining
medical source opinion of Dr. Aram, Psy.D., as an expert
medical opinion and as supported and consistent with the
objective medical evidence of record (Tr. at 22).  Dr.
Previti, also a non-examining state agency medical
consultant, rendered an opinion that was given less weight
by the ALJ because "[t]he objective evidence of record
establishes that the claimant has a significantly greater
physical residual functional capacity than opined" by Dr.
Previti (Tr. at 22).

No weight was given to the findings of disability by
the Veteran's Administration and Missouri Division of Family
Services because "a decision by any other governmental
agency is based on its rules and not based on social
security law and regulations and is therefore not binding.
These findings are not supported by the objective medical
evidence of record or consistent with the other evidence as
a whole.  Further, the undersigned notes that both these
findings of disability were made subsequent to the date the
claimant was last insured for a period of disability and
disability insurance benefits." (Tr. at 22-23).  The ALJ
found plaintiff's allegations of disabling impairments not

37

credible (Tr. at 23). He gave little weight to the testimony of plaintiff's wife (Tr. at 24).

The ALJ determined that plaintiff has the residual functional capacity to lift or carry 20 pounds occasionally and ten pounds frequently and to stand or walk for more than six hours in an eight-hour workday (Tr. at 23). He could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl (Tr. at 23). He could work with concentrated exposure to extreme cold, heat, humidity, noise, and vibration (Tr. at 23).

The ALJ determined that plaintiff could return to his past relevant work as a clergy member as that job is generally performed in the national economy (Tr. at 25). In so finding, he took administrative notice of the Dictionary of Occupational Titles which states that the occupation of clergy member, DOT 120.107-010, is a skilled, light exertional level job that does not require more than occasional climbing, balancing, stooping, kneeling, crouching, or crawling or concentrated exposure to extreme cold, heat, humidity, noise, or vibration (Tr. at 25).

Step five. Alternatively, the ALJ found that "[e]ven if the claimant were given the maximum benefit of the doubt and it was assumed he was further limited to a residual

38

functional capacity to lift and carry no more than 10 pounds occasionally and less weight frequently; stand or walk no more than 2 hours in an 8 hours workday; sit no more than six hours in an 8-hour workday, climb ramps or stairs, balance, stoop, kneel, crouch, or crawl no more than occasionally; and no concentrated exposure to extreme cold, heat, humidity, noise, or vibration, the claimant could nonetheless still perform other work." (Tr. at 25). Plaintiff could be an assembler in light electronics, with 41 jobs in the 12-county regional area and 1,670 in Missouri, or he could be a surveillance system monitor with 31 jobs in the 12-county area and 280 in the State of Missouri (Tr. at 25).

Therefore, plaintiff was found not disabled at the fourth step of the sequential analysis, and alternatively at the fifth step of the sequential analysis.

## VI. PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ erred in (1) discounting the opinion of Dr. Previti who found that plaintiff had a less than sedentary residual functional capacity, (2) assessing plaintiff's residual functional capacity, and (3) finding that plaintiff could return to his past relevant work as a pastor.

39

***Assessment of Dr. Previti***

Dr. Vincent Previti was a non-examining consulting doctor who completed a Physical Residual Functional Capacity Assessment on August 28, 2002. In support of his finding that plaintiff could lift ten pounds occasionally and less than ten pounds frequently and stand or walk for two hours, Dr. Previti relied on plaintiff's allegations of muscle aches and pains every day, headaches, fatigue, back pain, and plaintiff's five pages of typed allegations. In support of Dr. Previti's finding that plaintiff's ability to speak was limited, he explicitly relied on plaintiff's allegation and even noted that there was no objective evidence to support this allegation. The environmental limitations found by Dr. Previti again are based solely on plaintiff's allegations, and Dr. Previti stated as much.

The ALJ found that plaintiff's allegations are not credible. Plaintiff has not challenged that finding. Because Dr. Previti's findings were based almost exclusively on plaintiff's allegations which are not credible, there is hardly an argument that the ALJ should have relied on Dr. Previti's assessment.

I find that the substantial evidence in the record as a whole supports the ALJ's decision to discount the opinion of

Dr. Previti which is based almost exclusively on plaintiff's non-credible allegations.

### RFC Assessment

The ALJ must determine a claimant's residual functional capacity based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and the claimant's credible description of his limitations. <u>McKinney v. Apfel</u>, 228 F.3d 860, 863 (8th Cir. 2000). The ALJ properly found plaintiff not credible. The medical records do not support the findings of Dr. Previti. Dr. Previti noted multiple times in his assessment that his findings were based on plaintiff's allegations, not on medical evidence.

The medical evidence does, however, support the ALJ's residual functional capacity assessment. The ALJ noted that plaintiff has been on no prescription medication or over-the-counter medication. He has had no functional restrictions imposed by any doctor other than for a short time when his wrist was healing after carpal tunnel surgery. Plaintiff claimed he suffers from fibromyalgia; however, plaintiff was never diagnosed with fibromyalgia, was never treated for fibromyalgia, and was noted to have none of the fibromyalgia tender points. Plaintiff claimed he was born

41

with incomplete hip joints and incomplete shoulder joints. There is no medical evidence to support those allegations. And in any event, it is clear that plaintiff was able to engage in substantial gainful activity despite these incomplete hip and shoulder joints. There is no evidence that plaintiff's hip and shoulder joints are any worse now than when he was born, and he mentioned several times to doctors that his joints have been in this condition since birth.

The records reflect that plaintiff had a normal treadmill stress test; a negative tilt table test; the CT scan of his head was unremarkable; he had normal chest x-rays; there was no evidence of acute cardiopulmonary process; he had a normal upper GI series; he had normal Holter monitor readings twice; he had a relatively normal sleep study with no apneas, no oxygen desaturation, and no significant rhythm problems with his heart; he had no cervical radiculopathy; he had normal lab work; he had negative straight leg raising; he had normal x-rays of the lumbar spine; and he had a negative screen for depression.

Plaintiff's argument that the ALJ should have considered the effects of plaintiff's "fibromyalgia, cardiac pain, neck pain, and headache pain" when determining

42

plaintiff's residual functional capacity, despite having
found that they are not severe impairments, is without
merit.  There is no evidence to support plaintiff's
subjective allegations regarding those impairments, the ALJ
found plaintiff's subjective allegations not credible, and
plaintiff has not challenged that finding.

Plaintiff claims that he suffers from constant extreme
pain and fatigue.  However, the medical records show no
weakness, no significant joint motion limitation, and no
atrophy.  In addition, plaintiff's daily activities are
entirely inconsistent with disability.  He milks goats,
feeds farm animals, drives (including driving his step
children around) despite his dizzy spells which he claims
occur several times per day and can result in his falling
off a chair.  He told his doctor he was jerked by a colt,
indicating he is involved with other animals besides his
goats.  He reported being a farmer in 2000 and again in
2002.  He reported in 2002 that he performs odd jobs.  He
helps keep the fences at his farm in repair and was
attending swamp meets in 2000.

Plaintiff told Dr. Lewandowski that sitting and
stooping relieve his back pain.  The medical records
indicate that plaintiff had full strength and full activity

43

with his hand by February 2, 2001, after his carpal tunnel surgery. Plaintiff's allegations that his hands go numb and the surgery did not help at all are contradicted by his telling his doctor he was pleased with the surgery and by the lack of any other medical records in which plaintiff complained of those symptoms after his surgery. In April 2002, plaintiff was asked whether he was unable to work because of his back and leg pain, and his response was "sometimes", even though this was six years after his alleged onset of disability.

The ALJ determined that plaintiff had the following capacity:

Lift or carry 20 pounds occasionally

Lift or carry ten pounds frequently

Stand or walk for six hours in an eight-hour day

Occasionally climb, balance, stoop, kneel, crouch, or crawl

Can work with concentrated exposure to extreme cold, heat, humidity, noise, and vibration

No doctor ever placed a lifting restriction on plaintiff. Furthermore, plaintiff testified at the administrative hearing that he thinks he could lift and carry 20 pounds.

44

No doctor ever placed a walking or standing restriction on plaintiff.  Plaintiff's fixing fences, feeding and milking farm animals, attending swamp meets, handling colts, etc., combined with the lack of any medical restrictions on standing or walking, support the ALJ's determination that plaintiff has little if any limitation in his ability to stand or walk.

The ALJ's assessment with regard to plaintiff's ability to climb, balance, stoop, kneel, crouch, or crawl is the same as that rendered by Dr. Previti, with which plaintiff agrees.

No doctor ever restricted plaintiff's ability to work around extreme cold, heat, humidity, noise, or vibration. Plaintiff never complained to any doctor that any of these environmental factors bother him.

Therefore, I find that the substantial evidence in the record supports the ALJ's residual functional capacity assessment.

***Step Four determination***

The ALJ found that plaintiff retained the residual functional capacity to return to his past relevant work as a pastor, taking administrative notice of the Dictionary of Occupational Titles, DOT 120.107-010, for "clergy member".

First plaintiff argues that the ALJ improperly used the
Dictionary of Occupational Titles to determine the physical
and mental demands of plaintiff's past relevant work.
However, 20 C.F.R. § 404.1560(b)(2) provides that the
government may use the "Dictionary of Occupational Titles"
and its companion volumes and supplements, published by the
Department of Labor, to obtain evidence needed to determine
whether a claimant can do his past relevant work, given his
residual functional capacity.

The Dictionary of Occupational Titles lists the
following description for clergy member:

120.107-010 CLERGY MEMBER (profess. & kin.) alternate
    titles: minister; preacher; priest; rabbi

    Conducts religious worship and performs other spiritual
    functions associated with beliefs and practices of
    religious faith or denomination as authorized, and
    provides spiritual and moral guidance and assistance to
    members: Leads congregation in worship services.
    Prepares and delivers sermons and other talks.
    Interprets doctrine of religion. Instructs people who
    seek conversion to faith. Conducts wedding and funeral
    services. Administers religious rites or ordinances.
    Visits sick and shut-ins, and helps poor. Counsels
    those in spiritual need and comforts bereaved. Oversees
    religious education programs. May write articles for
    publication and engage in interfaith, community, civic,
    educational, and recreational activities sponsored by
    or related to interest of denomination. May teach in
    seminaries and universities. May serve in armed forces,
    institutions, or industry and be designated Chaplain
    (profess. & kin.). When in charge of Christian church,
    congregation, or parish, may be designated Pastor
    (profess. & kin.) or Rector (profess. & kin.). May

46

carry religious message and medical or educational aid
to nonchristian lands and people to obtain converts and
establish native church and be designated Missionary
(profess. & kin.).

GOE: 10.01.01 STRENGTH: L GED: R6 M4 L6 SVP: 8 DLU: 77

The codes at the bottom of the entry mean the following:

**GOE:** Guide for occupational exploration, provides
additional information about the interests, aptitudes,
entry level preparation and other traits required for
successful performance in various occupations.

**STRENGTH:** Strength requirement is light. Light work
requires the following abilities:
Exerting up to 20 pounds of force occasionally,
and/or up to 10 pounds of force frequently, and/or
a negligible amount of force constantly
(Constantly: activity or condition exists 2/3 or
more of the time) to move objects. Physical demand
requirements are in excess of those for Sedentary
Work. Even though the weight lifted may be only a
negligible amount, a job should be rated Light
Work: (1) when it requires walking or standing to
a significant degree; or (2) when it requires
sitting most of the time but entails pushing
and/or pulling of arm or leg controls; and/or (3)
when the job requires working at a production rate
pace entailing the constant pushing and/or pulling
of materials even though the weight of those
materials is negligible. NOTE: The constant stress
and strain of maintaining a production rate pace,
especially in an industrial setting, can be and is
physically demanding of a worker even though the
amount of force exerted is negligible.

**GED:** General education development in reasoning,
mathematical, and language. There are six levels with
six being the highest.

**SVP:** Specific Vocational Preparation is defined as the
amount of lapsed time required by a typical worker to
learn the techniques, acquire the information, and
develop the facility needed for average performance in

47

a specific job-worker situation. This training may be
acquired in a school, work, military, institutional, or
vocational environment. It does not include the
orientation time required of a fully qualified worker
to become accustomed to the special conditions of any
new job. Specific vocational training includes:
vocational education, apprenticeship training, in-plant
training, on-the-job training, and essential experience
in other jobs.

An SVP of 8 means over four years up to and including
ten years.

**DLU**: Date of last update, 1977

It is the SVP, or Specific Vocational Preparation,

level with which plaintiff takes exception in this case.  He

argues that the SVP level of 8 indicates that one needs four

to ten years of training to perform this job.  He argues

that the evidence shows that he has only three years of

bible college.  But more importantly, plaintiff argues, he

testified that he converted from his former Nazarene faith

to "Masonic" or "Messianic" Judaism and stated that he is

now loosely affiliated with the Nazarene-Israel sect.

Plaintiff was not trained to be a clergy member in the

Jewish faith, and he is no longer qualified to returned to

his past relevant work because he allegedly no longer

carries those beliefs.

This is a difficult argument due to the taboo nature of

the mixture of religion and government.  Yet plaintiff seems

48

to be arguing that the government should pay him disability benefits because he decided to convert from the Nazarene faith to the Jewish faith, and he wants that result without any evidence of this conversion other than his own assertion that it is so. Plaintiff testified that he does not attend any religious services. There is no evidence from any other person indicating that defendant changed his beliefs or his religious practices.

A claimant can only be found disabled if he is unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. See 20 C.F.R. § 404.1505. According to plaintiff's argument, he cannot do the job of clergy member because he changed his religious beliefs. It does not appear that that is grounds for awarding disability benefits, for it would be because of plaintiff's changed personal beliefs (a change which has not manifested itself in any aspect of his daily life, according to this record) rather than because of his impairments that he could not perform the job of clergy member.

The regulations provide that a claimant will be found not disabled if his residual functional capacity and vocational abilities make it possible for him to do work which exists in the national economy, but he remains unemployed because of--

(1) Your inability to get work;

(2) Lack of work in your local area;

(3) The hiring practices of employers;

(4) Technological changes in the industry in which you have worked;

(5) Cyclical economic conditions;

(6) No job openings for you;

(7) You would not actually be hired to do work you could otherwise do; or

(8) **You do not wish to do a particular type of work.**

20 C.F.R. § 404.1566(c) (emphasis added).

In this case, plaintiff's argument that he is not qualified to return to his past relevant work as a clergy member is based solely on his desire not to do that type of work any longer. Under the regulations, this should result in a finding of not disabled.

Finally, I note that the ALJ made an alternate finding at step five of the sequential analysis, stating that even if plaintiff's residual functional capacity were as stated

50

by Dr. Previti, he would be able to perform other work in significant numbers in the economy.

## VII.  CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record supports the ALJ's finding that plaintiff retains the residual functional capacity to return to his past relevant work as a pastor.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.

_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
August 24, 2005

51